14-35555

IN THE

# United States Court of Appeals

## FOR THE NINTH CIRCUIT

❖❖

ANNA JO SMITH,

*Plaintiff-Appellant,*

—v.—

BARACK OBAMA, in his official capacity as President of the United States of America; JAMES R. CLAPPER, in his official capacity as Director of National Intelligence; KEITH B. ALEXANDER, in his official capacity as Director of the National Security Agency and Chief of the Central Security Service; CHARLES T. HAGEL, in his official capacity as Secretary of Defense; ERIC H. HOLDER, JR., Attorney General; JAMES B. COMEY, in his official capacity as Director of the Federal Bureau of Investigation,

*Defendants-Appellees.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO (BOISE); CASE NO. 2:13-CV-00257-BLW,
THE HONORABLE B. LYNN WINMILL, CHIEF DISTRICT JUDGE

## BRIEF OF *AMICUS CURIAE* PEN AMERICAN CENTER, INC. IN SUPPORT OF PLAINTIFF-APPELLANT

*Of Counsel*:

  EDWARD J. DAVIS
  LINDA STEINMAN
  LACY H. KOONCE, III

DAVIS WRIGHT TREMAINE LLP
1633 Broadway, 27th Floor
New York, New York 10019
(212) 489-8230

THOMAS R. BURKE
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California 94111
(415) 276-6500

*Counsel for Amicus Curiae*
  *PEN American Center, Inc.*

# TABLE OF CONTENTS

**Page**

INTEREST OF AMICUS CURIAE .......................................................................1

SUMMARY OF ARGUMENT .............................................................................1

ARGUMENT .......................................................................................................3

    I.     THE PEN DECLARATION ON DIGITAL FREEDOM...................3

    II.    THE IMPACT OF MASS GOVERNMENT SURVEILLANCE
          ON THE CRITICAL ZONE OF PRIVACY WRITERS NEED ..........5

         A.    The History of Abuses of Surveillance .......................................7

         B.    Self-Censorship, Communication, and Creativity ....................10

              1.    Government Surveillance as a Curb on Creative
                   Thought and Expression ..................................................11

              2.    The High Sensitivity of Telephone Metadata.................16

              3.    The Impact on Writers:  The PEN Writers Survey ........23

    III.    BALANCING FREEDOM AND SECURITY ..................................26

CONCLUSION ...................................................................................................27

DWT 24737867v4 0200656-000001

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Clapper v. Amnesty Int'l,*
  133 S. Ct. 1138 (2013) .......................................................................9

*Klayman v. Obama,*
  No. 13-0851, 2013 WL 6571596, at *18 (D.D.C. Dec. 16, 2013) ....................20

*Olmstead v. United States,*
  277 U.S. 438 (1928) ....................................................................5, 27

*Riley v. California,*
  134 S. Ct. 2473 (2014) ...............................................................19, 20

*Smith v. Maryland,*
  442 U.S. 735 (1979) .........................................................18, 19, 20, 21

*Smith v. Obama,*
  No. 2:13-cv-257-BLW, 2014 WL 2506421 (D. Idaho June 3, 2014) ..........18, 21

*United States v. Jones,*
  132 S. Ct. 945 (2012) .......................................................6, 17, 18, 19

*United States v. Maynard,*
  615 F.3d 544 (D.C. Cir. 2010), *aff'd sub nom. United States v.*
  *Jones*, 132 S. Ct. 945 (2012) ..........................................................17

*United States v. U.S. Dist. Ct. (Keith),*
  407 U.S. 297 (1972) ...........................................................................6

**Statutes**

Video Privacy Protection Act, 18 U.S.C. § 2710 ...................................20

**Other Authorities**

PEN Declaration on Digital Freedom ......................................................3

PEN, *Two Views on How Surveillance Harms Writers* (Sept. 3, 2013) ...................7

DWT 24737867v4 0200656-000001

PEN American Center, *Chilling Effects: NSA Surveillance Drives U.S. Writers to Self-Censor* (Nov. 12, 2013)..............................................................24

PEN American Center, *The Impact of US Government Surveillance on Writers: Findings From a Survey of PEN Membership* (Oct. 31, 2013) ......................................................................................23, 24, 25

American Library Association, *State Privacy Laws Regarding Library Records,* http://www.ala.org/advocacy/ privacyconfidentiality/privacy/stateprivacy ......................................19

James Bamford, *The Shadow Factory: The NSA from 9/11 to the Eavesdropping on America* (2008) ......................................................10

Jeremy Bentham, *The Panopticon Writings* (Miran Bozovic, ed., 1995) .............................................................................................13

Julie E. Cohen, *Examined Lives: Informational Privacy and the Subject as Object*, 52 Stan. L. Rev. 1373 (2000).................................12

Noam Cohen, *Surveillance Leaves Writers Wary*, New York Times (Nov. 11, 2013)...............................................................................24, 26

William O. Douglas, *Points of Rebellion* (1969)......................................13

Michael Foucault, *Discipline and Punish* (1975) ....................................14

Franz Kafka, *The Trial* (1925) ...............................................................14

Jane Mayer, *What's The Matter With Metadata?*, New Yorker (June 6, 2013) ...........................................................................................16

Victor Navasky, *Naming Names* (1980) ..................................................8

Robert O'Harrow, *No Place to Hide* 10 (2006).........................................9

Presidential Review Group on Intelligence and Communications Technologies, *Liberty and Security in a Changing World*, 116-17 (Dec. 12, 2013), http://1.usa.gov/1cBct0k ("PRG Report")...........................6,15

Letter from Gary Pruitt to Attorney General Eric Holder (May 13, 2013) .................................................................................................22

Natalie Robins, *Alien Ink* (1992) .............................................................8

DWT 24737867v4 0200656-000001

Alan Rusbridger, *The Snowden Leaks and the Public*, New York Review of Books (Nov. 21, 2013) .................................................................... 16

Julian Sanchez, *On Fiction and Surveillance* (May 14, 2012), http://www.pen.org/nonfiction/julian-sanchez-fiction-and-surveillance ........................................................................................... 12

David K. Shipler, *The Rights of the People: How Our Search for Safety Invades Our Liberties* 294-95 (2011) ...................................... 11

Larry Siems, *A Blacklisted Screenwriter on American Surveillance* (Aug. 30, 2013) ......................................................................... 8, 12

Daniel J. Solove, *The Digital Person* (2004) ........................................... 14

Daniel J. Solove, *Five Myths About Privacy*, Washington Post (June 13, 2013) ...................................................................................... 16

Melvin I. Urofsky and Philip E. Urofsky eds., *Selections from the Private Papers of Justice William O. Dougla*s 162 (1987) ................................. 26

U.S. Senate Select Committee to Study Governmental Operations with Respect to Intelligence Activities and the Rights of Americans (Book II), S. Rep. No. 94-755 (1976) ................................................. 8

iv

## INTEREST OF AMICUS CURIAE

PEN American Center, Inc. is a non-profit association of writers that includes poets, playwrights, essayists, novelists, editors, screenwriters, journalists, literary agents, and translators ("PEN").  PEN has approximately 3,700 members and is affiliated with PEN International, the global writers' organization with 144 centers in more than 100 countries in Europe, Asia, Africa, Australia, and the Americas.  PEN International was founded in 1921, in the aftermath of the first World War, by leading European and American writers who believed that the international exchange of ideas was the only way to prevent disastrous conflicts born of isolation and extreme nationalism.  Today, PEN works along with the other chapters of PEN International to advance literature and protect the freedom of the written word wherever it is imperiled.  It advocates for writers all over the world. The interest of PEN in this case is in protecting the freedoms of writers in the United States under the First and Fourth amendments.[1]

## SUMMARY OF ARGUMENT

The aim of this *amicus* brief is to highlight the profound effect on writers of the comprehensive nationwide collection of telephone call records by the National Security Agency ("NSA").  The government's collection of data on every phone

---

[1] All parties to this appeal consent to the filing of this *amicus* brief.  This brief was authored entirely by counsel for *amicus curiae* PEN.  No counsel for any party authored the brief in any part, nor did any party (or any person other than PEN and its counsel) contribute money to fund its preparation or submission.

call made or received in the United States intrudes upon a personal zone of privacy that the Fourth Amendment protects and that is also essential to the freedom of expression and association. The District Court felt compelled to base its decision on a line of Fourth Amendment authority that dramatically undervalues individuals' expectations of privacy and does not take into account at all the impact that the mass collection of such detailed, highly personal information can also have – and does have – on freedom of expression.

A recent survey of writers commissioned by PEN confirms that the impact of this intrusion is far from hypothetical: writers have changed their behavior because they know the government is recording information about all their calls. Writers are curtailing communication with sources and colleagues; they are avoiding writing about certain topics; and they are not pursuing research they otherwise would.

Over the last century, American writers have been the targets of government surveillance and even persecution, often in the name of national security. Abuses have occurred not only during the McCarthy era and J. Edgar Hoover's reign at the FBI, but in every administration through the present day. That history deepens the apprehensions of writers at the NSA's mass recording of telephone metadata.

The expectation of privacy that permits the free flow of ideas is essential to democracy, and that expectation is eroded by the government's collection of

DWT 24737867v4 0200656-000001

records of all our communications.  As writers have warned for generations, and PEN's survey confirms, people who are aware that every move they make is being recorded by a government bureaucracy – even an ostensibly benign one – inevitably censor themselves.  PEN is profoundly concerned that, because of the NSA's metadata collection, our private communications will become less frank, our associations will become more limited, the scope of thought will shrink, and our democracy will be debased.

## ARGUMENT

## I.  THE PEN DECLARATION ON DIGITAL FREEDOM

Since its founding, PEN has campaigned against government intrusions and the inhibiting effects they can have upon free expression.  The dramatic expansion of government surveillance in the digital age has acutely raised PEN's concerns. In September 2012, the PEN Assembly of Delegates, representing 20,000 writers, adopted the PEN Declaration on Digital Freedom (the "PEN Declaration").[2] Government surveillance is the focus of one of the four cardinal principles in the PEN Declaration:

> All persons have the right to be free from government surveillance of digital media.

---

[2] *Available at* http://www.pen-international.org/pen-declaration-on-digital-freedom/declaration-on-digital-freedom-english/.

The PEN Declaration explains why freedom from government surveillance of our electronic communications is crucial:

> a.  Surveillance, whether or not known by the specific intended target, chills speech by establishing the potential for persecution and the fear of reprisals. When known, surveillance fosters a climate of self-censorship that further harms free expression.

The Declaration then sets out the implications of this principle for governments around the world:

> b.  As a general rule, governments should not seek to access digital communications between or among private individuals, nor should they monitor individual use of digital media, track the movements of individuals through digital media, alter the expression of individuals, or generally surveil individuals.

> c.  When governments do conduct surveillance – in exceptional circumstances and in connection with legitimate law enforcement or national security investigations – any surveillance of individuals and monitoring of communications via digital media must meet international due process laws and standards that apply to lawful searches, such as obtaining a warrant by a court order.

> d.  Full freedom of expression entails a right to privacy; all existing international laws and standards of privacy apply to digital media, and new laws and standards and protections may be required.

> e.  Government gathering and retention of data and other information generated by digital media, including data mining, should meet international laws and standards of privacy, such as requirements that the data retention be

4

time-limited, proportionate, and provide effective notice
to persons affected.

PEN Declaration ¶ 3.

## II. THE IMPACT OF MASS GOVERNMENT SURVEILLANCE ON THE CRITICAL ZONE OF PRIVACY WRITERS NEED

To make original contributions to public discourse, writers must be confident that they are protected by a zone of privacy. The Constitution protects that zone of privacy. As the Foreign Intelligence Surveillance Court ("FISC") that issued the Order permitting the data collection at issue in this case (the "Order") has explained, "[a] person's 'papers' are among the four items that are specifically listed in the Fourth Amendment as subject to protection against unreasonable search and seizure. Whether they are transmitted by letter, telephone or email, a person's private communications are akin to personal papers." *See* Memorandum Opinion of the United States Foreign Intelligence Surveillance Court at 16 n.14 (Oct. 3, 2011) ("FISC Opinion"), at 74-75.[3] The freedom to communicate with whomever one chooses, away from the prying eyes of the state, is an essential condition for creativity and critical writing, and especially for dissent.

Our Fourth Amendment rights to freedom from intrusion are bound closely to our rights under the First Amendment to freedom of association and freedom of expression. *See, e.g.*, *Olmstead v. United States*, 277 U.S. 438, 478 (1928)

---

[3] *Available at* http://www.scribd.com/doc/162016974/fisa-court-opinion-with-exemptions/.

(Brandeis, J., dissenting) ("The makers of our Constitution . . . sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the government, the right to be let alone-the most comprehensive of rights and the right most valued by civilized men."); *United States v. U.S. Dist. Ct. (Keith),* 407 U.S. 297, 314 (1972) ("The price of lawful public dissent must not be a dread of subjection to an unchecked surveillance power."). Justice Sotomayor recently echoed this concern: "Awareness that the Government may be watching chills associational and expressive freedoms." *United States v. Jones*, 132 S. Ct. 945, 956 (2012) (concurrence).

The Presidential Review Group on Intelligence and Communications Technologies ("PRG") appointed by President Obama reached the same conclusion after carefully studying the data collection program at issue here: "Knowing that the government has ready access to one's phone call records can seriously chill 'associational and expressive freedoms.'" Presidential Review Group on Intelligence and Communications Technologies, *Liberty and Security in a Changing World*, 116-17 (Dec. 12, 2013), http://1.usa.gov/1cBct0k ("PRG Report") (quoting *Jones*, 132 S. Ct. at 956 (Sotomayor, J., dissenting)).

Philosopher Kwame Anthony Appiah, a former president of PEN, has elucidated some of the dangers that surveillance threatens for writers and society:

> Great moral advances begin often as radical ideas, ideas
> that would lead those who have them to be subjected to

6

> obloquy or even to violence. Serious thinking is done by
> writing and by exchanges of ideas with others.  In a
> society that lived through the abuses of state power
> against Dr. Martin Luther King Jr. we cannot think that
> we will only be endangered if we are in the wrong. I have
> sometimes thought, myself, as I reflected on issues about
> the morality of terrorism and our responses to it, that I
> must censor myself in my most private writings because I
> cannot be sure that my writings will not be spied upon,
> misconstrued, used against me.

PEN, *Two Views on How Surveillance Harms Writers* (Sept. 3, 2013).[4]

Though it is often difficult to discern and quantify, the harm of
self-censorship is real.  Writers have experienced it before (*see* Section II.A.,
below).  Writers also have used the tools of their trade to illustrate how
surveillance inhibits their thought and freedom and, more broadly, how such
monitoring affects all citizens (*see* Section II.B.1., below).  And writers have now
confirmed through PEN's survey that the NSA's mass data collection is already
having a concrete impact on them and their work (*see* Section II.B.3., below).

### A.    The History of Abuses of Surveillance

Throughout history, writers, artists, and public intellectuals have been
particularly susceptible to intrusive surveillance and scrutiny by the government.
During the twentieth century, the FBI maintained active surveillance and
investigation files on more than 150 writers, including James Baldwin, Truman
Capote, Willa Cather, T.S. Eliot, William Faulkner, F. Scott Fitzgerald, Lillian

---

[4] *Available at* http://www.pen.org/blog/two-views-how-surveillance-harms-writers.

Hellman, Ernest Hemingway, Sinclair Lewis, Henry Miller, Dorothy Parker, Gertrude Stein, John Steinbeck, Tennessee Williams, and Richard Wright. *See* Natalie Robins, *Alien Ink* (1992). As PEN member Natalie Robins concluded, although this practice was often the result of a combination of "paranoia," "conspiracy," "monumental bureaucratic overkill," and agents "simply doing their job," "one thing is certain: most of the writers were watched because of what they thought." *Id.* at 17.

Such abuses have been especially frequent during times of heightened national security concerns. During the McCarthy era, for example, writers and artists suspected of having Communist leanings were interrogated by Congress and the FBI and blacklisted if they did not inform on their colleagues. Writers were visited frequently by the FBI. Their neighbors were interviewed and their garbage was examined. They masked their identities to find work. *See* Larry Siems, *A Blacklisted Screenwriter on American Surveillance* (Aug. 30, 2013);[5] *see also* Victor Navasky, *Naming Names* (1980).

The FISC itself was established in response to the repeated abuse by law enforcement and intelligence agencies of their surveillance powers and the misuse of information obtained for otherwise lawful purposes. Reports of the U.S. Senate Select Committee to Study Governmental Operations with Respect to Intelligence

---

[5] *Available at* http://www.pen.org/blacklisted-screenwriter-american-surveillance.

8

Activities (the "Church Committee") detailed "intelligence excesses" in every

presidential administration and described, for instance, how the FBI under J. Edgar

Hoover "targeted Dr. Martin Luther King, Jr., in an effort to 'neutralize' him as a

civil rights leader." *See* Brief of Former Church Committee Members and Staff as

*Amici Curiae* Supporting Respondents and Affirmance at 4, 9-13, *Clapper v.

Amnesty Int'l*, 133 S. Ct. 1138 (2013) (No. 11-1025).

The Church Committee specifically warned that the NSA had the "potential

to violate the privacy of American citizens [that was] unmatched by any other

intelligence agency." U.S. Senate Select Com. to Study Governmental Operations

with Respect to Intelligence Activities and the Rights of Americans (Book II), S.

Rep. No. 94-755, at 202 (1976).[6] Senator Frank Church, the chair of the

Committee, observed in 1975:

> [The National Security Agency's] capability at any time
> could be turned around on the American people, and no
> American would have any privacy left, such is the
> capability to monitor everything: telephone
> conversations, telegrams, it doesn't matter. There would
> be no place to hide.

Robert O'Harrow, *No Place to Hide* 10 (2006). The Committee found the record

of NSA so troubling that, as James Bamford recounts, its draft report rejected the

"NSA's appeal to the Congress and the public that they simply trust us" because it

was "totally unjustified when viewed in the light of the Agency's long record of

---

[6] *Available at* http://www.intelligence.senate.gov/pdfs94th/94755_II.pdf.

9

privacy violations." *The Puzzle Palace: Inside the National Security Agency, America's Most Secret Intelligence Organization*, 387 (1982).

The NSA's ability – and tendency – to engage in mass warrantless surveillance of innocent Americans has only grown since then. *See* James Bamford, *The Shadow Factory: The NSA from 9/11 to the Eavesdropping on America* (2008). Today, it is engaged in surveillance on a scale and to a degree previously barely imagined, and it has deliberately evaded legal safeguards established to protect Americans' privacy. In 2011, the FISC found that the NSA had been collecting information for years knowing that its authorization for the collection was based on a false premise and upbraided the NSA because that was "the third instance in less than three years in which the government has disclosed a substantial misrepresentation regarding the scope of a major collection program." FISC Opinion at 16 n.14.

In light of this history, writers have every reason to worry about the government's voracious collection of so much sensitive information.

## B.     Self-Censorship, Communication, and Creativity

The very collection of telephone metadata interferes with the work of writers – whether or not they are directly intimidated, and whether or not the government ever analyzes the information it collects on any one writer. The mere knowledge that the information is being gathered and stored inhibits communications and

10

suppresses expression in insidious ways that writers have richly illuminated, in

fiction and non-fiction, through the years.

> **1.     Government Surveillance as a Curb on Creative Thought and Expression**

As PEN member David K. Shipler has written:

> Privacy is like a poem, a painting, a piece of music. It is precious in itself.  Government snooping destroys the inherent poetry of privacy, leaving in its absence the artless potential for oppression. At the least, if the collected information is merely filed away for safekeeping, a weapon is placed in the hands of the state. If it is utilized, acute consequences may damage personal lives. Even where government is benign and well-meaning – a novelty that neither James Madison nor Tom Paine imagined – the use of everyday information about someone's past to predict his behavior can lead to obtrusive mistakes ….

*The Rights of the People: How Our Search for Safety Invades Our Liberties* 294-95

(2011).

Social scientists have confirmed that surveillance inevitably shrinks the

variety of ideas people entertain and express:

> [T]he experience of being watched will constrain, ex ante, the acceptable spectrum of belief and behavior.  Pervasive monitoring of every first move or false start will, at the margin, incline choices toward the bland and the mainstream. The result will be a subtle yet fundamental shift in the content of our character, a blunting and blurring of rough edges and sharp lines.  But rough edges and sharp lines have intrinsic, archetypal value within our culture.  Their philosophical differences aside, the coolly rational Enlightenment thinker, the unconventional

11

> Romantic dissenter, the skeptical pragmatist, and the
> iconoclastic postmodernist all share a deep-rooted
> antipathy toward unreflective conformism.  The condition
> of no-privacy threatens not only to chill the expression of
> eccentric individuality, but also, gradually, to dampen the
> force of our aspirations to it.

Julie E. Cohen, *Examined Lives: Informational Privacy and the Subject as Object*,

52 Stan. L. Rev. 1373, 1425-26 (2000) (citing psychological studies indicating that

"lack of privacy makes people less inclined to experiment and less inclined to seek

help").

The screenwriter Walter Bernstein, who lived through blacklisting in the

1950s, believes the NSA's mass surveillance today has created a climate of fear

that necessarily cramps thought:  "It's not an atmosphere that helps create

creativity or lets the mind run free.  You're always in danger of self-censorship…."

Siems, *A Blacklisted Screenwriter.*

Authors have also often created fictional worlds more extreme than reality to

warn the public at large about the prying eyes of a powerful state and to underscore

the critical importance of privacy to human creativity.  As writer Julian Sanchez

has observed, when we discuss surveillance and privacy, "we speak a language

borrowed from fiction."  *On Fiction and Surveillance* (Introduction to PEN World

12

Voices Festival panel: "Life in the Panopticon: Thoughts on Freedom in an Era of Pervasive Surveillance") (May 14, 2012).[7]

The most common literary reference point for state surveillance is, of course, George Orwell's dystopian novel, *1984* (1949). *See, e.g.*, William O. Douglas, *Points of Rebellion* 29 (1969) ("Big Brother … will pile the records high with reasons why privacy should give way to national security, to law and order, to efficiency of operation, to scientific advancement and the like."). By depicting a totalitarian society ruled by an omniscient regime, Orwell vividly illustrated the dangers of a powerful surveillance state.

Other writers have explored the power of surveillance alone, even without Orwellian government repression. The title of the PEN World Voices Festival panel noted above refers to the "Panopticon" devised by British philosopher Jeremy Bentham – a circular prison with a central observation tower to permit guards to see inmates in their cells at all times without letting the inmates know whether they were being watched at any time. Bentham called it "a new mode of obtaining power of mind over mind, in a quantity hitherto without example." Jeremy Bentham, *The Panopticon Writings* (Miran Bozovic, ed., 1995). The Panopticon aptly illustrates how the comprehensive collection of telephone call

---

[7] *Available at* http://www.pen.org/nonfiction/julian-sanchez-fiction-and-surveillance.

DWT 24737867v4 0200656-000001

data affects society, even if we never know whether any particular record is actually examined.

The philosopher Michel Foucault used the concept of the Panopticon as a metaphor to analyze modern structures of power in his work *Discipline and Punish* (1975). Like Bentham, Foucault recognized that actual surveillance is not necessary to achieve the desired effect of control. The mere knowledge that, at any given moment, one *could* be watched is sufficient: "Hence the major effect of the Panopticon: to induce in the inmate a state of conscious and permanent visibility that assures the automatic functioning of power." *Id.* at 201. Foucault concluded that individuals subject to the constant possibility of surveillance – whether in a building or in society at large – come to internalize "the constraints of power," censoring themselves and permitting whoever is in authority to exert more and more control with less and less need to exert any physical force. *Id.* at 202-03.

Another literary illustration of the impact of government surveillance is found in the work of Franz Kafka. In *The Trial* (1925), Joseph K. is arrested without explanation and discovers that "[a] vast bureaucratic court has apparently scrutinized his life and assembled a dossier on him. The court is clandestine and mysterious, and court records are 'inaccessible to the accused.'" Daniel J. Solove, *The Digital Person* 27-55, 36 (2004). He engages in a maddening and largely fruitless quest to understand the charges against him and who brought them. The

14

"Kafka-esque" danger of surveillance data is not necessarily that agencies will be "led by corrupt and abusive leaders," but rather that mass collection of data "shift[s] power toward a bureaucratic machinery that is poorly regulated and susceptible to abuse," a "shift [with] profound social effects," "because it alters the balance of power between the government and the people … ." *Id.* at 178.

Less than a year ago, the PRG established by President Obama echoed these concerns about the "Panopticon" effect and "Kafka-esque" government, concluding that "knowing that the government is one flick of a switch away from [all of the citizenry's phone records] can profoundly alter the relationship between citizen and government in a way that is inimical to society.  That knowledge can significantly undermine public trust, which is exceedingly important to the well-being of a free and open society."  PRG Report at 117.

History has shown that the NSA is, in fact, poorly regulated and vulnerable to abuse (*see* Section II.A., above).  But, even if the information the NSA gathers were never misused, the mere possibility that the government may know who is communicating with whom and have the capacity to investigate who is exploring ideas that may be deemed dangerous raises alarms for writers and hampers free thought.

DWT 24737867v4 0200656-000001

## 2.    The High Sensitivity of Telephone Metadata

Aggregated "telephony metadata" can reveal highly private information, and that information is often particularly sensitive for writers. As a former general counsel of the NSA has stated, "Metadata absolutely tells you everything about somebody's life. If you have enough metadata you don't really need content…. [It's] sort of embarrassing how predictable we are as human beings."  Alan Rusbridger, *The Snowden Leaks and the Public*, New York Review of Books (Nov. 21, 2013) (quoting Stewart Baker).  Metadata can reveal extremely private facts and provide a map of personal associations across the country and the world:

> Whom someone is talking to may be just as sensitive as what's being said. Calls to doctors or health-care providers can suggest certain medical conditions. Calls to businesses say something about a person's interests and lifestyle. Calls to friends reveal associations, potentially pointing to someone's political, religious or philosophical beliefs.

Daniel J. Solove, *Five Myths About Privacy*, Washington Post (June 13, 2013) (warning of the possibility of tracking "the entire country's social and professional connections."); *see also* Jane Mayer, *What's The Matter With Metadata?*, New Yorker (June 6, 2013) (metadata may reveal impending corporate takeovers,

16

sensitive political information such as whether and where opposition leaders may meet, and who is romantically involved with whom).[8]

In many ways, telephone metadata can be likened to GPS tracking data that law enforcement officers have sought to collect and use without a warrant. As the D.C. Circuit explained in a decision that was affirmed by the Supreme Court, "[a] person who knows all of another's travels can deduce whether he is a weekly church goer, a heavy drinker, a regular at the gym, an unfaithful husband, an outpatient receiving medical treatment, an associate of particular individuals or political groups – and not just one such fact about a person, but all such facts." *United States v. Maynard*, 615 F.3d 544, 562 (D.C. Cir. 2010), *aff'd sub nom. United States v. Jones*, 132 S. Ct. 945 (2012). Justice Sotomayor, concurring in the affirmance, noted that "GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations. The Government can store such records and efficiently mine them for information years into the future." *United States v. Jones*, 132 S. Ct. at 955-56 (Sotomayor, J., concurring).

The District Court concluded that this case was controlled by a line of decisions suggesting that, notwithstanding these concerns, people have no

---

[8] *Available at* http://www.newyorker.com/news/news-desk/whats-the-matter-with-metadata.

expectation of privacy in such information simply because, as a technical matter, it is shared with the private companies that carry the telephone calls.  The decisions rely primarily on the Supreme Court's conclusion more than 30 years ago, in *Smith v. Maryland*, 442 U.S. 735, 742 (1979), that a "pen register" on the telephone of a criminal suspect did not amount to an unconstitutional search because the information it collected was already being shared with the phone company.  *See Smith v. Obama*, No. 2:13-cv-257-BLW, 2014 WL 2506421, at *2 (D. Idaho June 3, 2014) (citing *United States v. Reed*, 575 F.3d 900 (9th Cir. 2009); *United States v. Forrester*, 512 F.3d 500 (9th Cir. 2008)).

But those decisions do not account for the Supreme Court's wider jurisprudence in the field, as the Appellants' brief outlines.  Further, Justice Sotomayor's concurrence in *Jones* rightfully questioned those decisions' underlying  premise, especially in the digital world.  She explained:

> This approach is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks. People disclose the phone numbers that they dial or text to their cellular providers; the URLs that they visit and the e-mail addresses with which they correspond to their Internet service providers; and the books, groceries, and medications they purchase to online retailers.  ...  I for one doubt that people would accept without complaint the warrantless disclosure to the Government of a list of every Web site they had visited in the last week, or month, or year. But whatever the societal expectations, they can attain constitutionally protected status only if our Fourth Amendment

18

> jurisprudence ceases to treat secrecy as a prerequisite for privacy. I would not assume that all information voluntarily disclosed to some member of the public for a limited purpose is, for that reason alone, disentitled to Fourth Amendment protection.

*Jones*, 132 S. Ct. at 957.[9]

The notion that an individual has no legitimate expectation of privacy in information simply because it is necessarily provided to third parties is unsustainable in the modern world.  All of us provide medical information to our doctors, insurers, and pharmacists, yet our society widely recognizes our privacy interests in this information, and multiple layers of federal and state laws protect medical privacy.  Library patrons necessarily share information about their reading with their libraries, but 48 states have laws protecting the confidentiality of library records in recognition of their private nature.  *See, e.g.*, Idaho Code § 9-340E; American Library Association, *State Privacy Laws Regarding Library Records,* http://www.ala.org/advocacy/ privacyconfidentiality/privacy/stateprivacy.

---

[9] As discussed more fully in Appellant's brief, just last term, the Supreme Court held that a warrant was required for a search of the cellphone of an individual being arrested.  *See Riley v. California*, 134 S. Ct. 2473 (2014).  Although the Court did not address the premise underlying *Smith* (because it was undisputed that a Fourth Amendment search had taken place), the Court plainly was concerned about the government's ability to use aggregated data to apprehend the "sum of an individual's private life," *id.* at 2489, without her knowledge and without a warrant, and expressly rejected the government's attempts to apply analog-era precedents to the digital world.  *See id.* at 2488 (comparing government's argument that a search of a cell phone was no different from a search of any item found in an arrestee's pocket to "saying a ride on horseback is materially indistinguishable from a flight to the moon").

DWT 24737867v4 0200656-000001

Congress likewise recognized the legitimate privacy of video rental information and passed the Video Privacy Protection Act, 18 U.S.C. § 2710. Every user of a smart phone, app, or EZ-Pass provides extensive information to third parties regarding their whereabouts and personal affairs. In the digital age, a constitutional doctrine that excludes any information provided to a third party from Fourth Amendment protection would gut the safeguards for our "papers" envisioned by the founders.[10]

These vital concerns were captured by the district court for the District of Columbia when it held unconstitutional the same telephone metadata collection program at issue in this case. As Judge Leon recognized there, "the evolutions in the Government's surveillance capabilities, citizens' phone habits, and the relationship between the NSA and telecom companies" make the circumstances "thoroughly unlike those considered by the Supreme Court thirty-four years ago" in *Smith v. Maryland*. *Klayman v. Obama*, No. 13-0851, 2013 WL 6571596, at *18 (D.D.C. Dec. 16, 2013). Hearkening to the original and enduring aims of the Fourth Amendment, Judge Leon concluded: "I cannot imagine a more

---

[10] Notably, the Supreme Court in *Riley* did not even consider the argument that a search of the data in (or accessible from) an arrestee's cell phone should not constitute a search because some of that data is necessarily shared with third parties. The Court did not question the arrestees' expectations of privacy in this information, and, in fact, directly rejected the argument that *Smith* would permit a search of an arrestee's phone's call log, both because there was no dispute that a search had taken place, but also because call logs typically reveal "more than just phone numbers." 134 S. Ct. at 2492-93.

DWT 24737867v4 0200656-000001

'indiscriminate' and 'arbitrary invasion' than this systematic and high-tech collection and retention of personal data on virtually every single citizen for purposes of querying and analyzing it without prior judicial approval." *Id.* at *24. As the District Court in this case aptly noted, "Judge Leon's decision should serve as a template for a Supreme Court opinion." 2014 WL 2506421, at *4.

Judge Leon's decision recognized the difference between "sharing" telephone metadata with *telephone companies*, which is necessary for calls to be completed, and the *government's* collecting and storing the information – which raises constitutional concerns. The Fourth Amendment protects citizens from the potential for government abuse and thereby protects the democratic control of our government. Governments have an inherent interest in, and long history of, suppressing political dissent. Private phone companies, on the other hand, retain data about our calls for business reasons. We do not give them the information they need to connect calls for us expecting it to be shared with anyone else and certainly not to be turned over to the government. Yet, under the Order, every telephone customer, like Joseph K. in *The Trial*, knows there is a dossier containing highly personal information about her in the hands of a government bureaucracy. Although it may be that no one has bothered to assemble that dossier for her yet, the potential is always present. If such surveillance becomes the norm, our tolerance for intrusions will naturally rise, and the zone of privacy will shrink

21

further as people become accustomed to it.  Ideas will not be tested.  Culture will contract, and the conditions that allow democracy to thrive will be eroded.

The government's mass collection of this type of information has a particular impact on writers and freedom of expression.  Writers of non-fiction often depend on confidential sources to inform their work.  Not only whistleblowers, but anyone who fears physical harm or other retribution may wish to remain anonymous.  When it was discovered recently that the Department of Justice had sought calling information for the phones of several employees of the Associated Press (the "AP"), Gary Pruitt, President and CEO of the AP, wrote to Attorney General Holder stating, "These records potentially reveal communications with confidential sources across all of the newsgathering activities undertaken by the AP during a two-month period, provide a road map to AP's newsgathering operations and disclose information about AP's activities and operations that the government has no conceivable right to know."  Letter from Gary Pruitt to Attorney General Eric Holder (May 13, 2013).[11]  Sources are far less likely to talk to authors if they know that the government is collecting and storing data on all their phone conversations.

The prospect that telephone metadata can reveal to the government the entire web of a writer's associations and interactions – and the contacts of all the writer's

[11] *Available at* http://www.ap.org/Images/Letter-to-Eric-Holder_tcm28-12896.pdf.

contacts – inevitably limits and deters valuable interactions.  Writers develop ideas through conversations, including conversations with radicals, dissidents, pariahs, victims of violence, and others who may be endangered if their communications become known.  Writers in the United States who support human rights or communicate with human rights activists, for instance, are acutely aware of the dangers of reprisals or sanctions against people with whom they speak, or those people's families and friends, here and in other countries where they may be more vulnerable.  Chilling these exchanges deprives us of valuable information and impoverishes thought.

### 3.     The Impact on Writers:  The PEN Writers Survey

A survey of PEN's members conducted during October 2013 shows how government surveillance is already affecting writers and their work.  The survey canvassed writers to learn their specific concerns about government surveillance, including "their sense of whether their own communications are being monitored, and the extent to which they are moderating their behavior as a result."  PEN American Center, *The Impact of US Government Surveillance on Writers: Findings From a Survey of PEN Membership* (Oct. 31, 2013) ("PEN Survey"),[12] at 1.  An accompanying report summarizes the Survey's findings and includes

---

[12] *Available at* http://www.pen.org/sites/default/files/Chilling%20Effects_PEN%20American.pdf, at 1-10.

DWT 24737867v4 0200656-000001

narrative responses describing writers' experiences and concerns.  PEN American

Center, *Chilling Effects: NSA Surveillance Drives U.S. Writers to Self-Censor*

(Nov. 12, 2013) ("PEN Report").[13]

The results are sobering.  As reported in the *New York Times*, the Survey

shows that a large majority of PEN respondents are "deeply concerned about

recent revelations regarding the extent of government surveillance of email and

phone records, with more than a quarter saying that they have avoided, or are

seriously considering avoiding, controversial topics in their work."  Noam Cohen,

*Surveillance Leaves Writers Wary*, New York Times (Nov. 11, 2013).  The Survey

reveals that 76% of respondents believe increased government surveillance is

particularly harmful to writers because it impinges on the privacy they need to

create freely.  PEN Survey, at 1-3.  Nearly 90% are concerned about the NSA's

program to collect and analyze metadata, and writers now assume that their

communications are monitored.  *Id.* at 2, 5.  A large majority believe that the

gathered data may be mismanaged or abused for years to come.  *Id.* at 1, 4.

These beliefs are constraining writers' behavior.  Many writers reveal that

they have avoided discussing or writing about controversial topics as result of the

presumed monitoring.  They have curtailed certain types of research; they have

---

[13] *Available at*
http://www.pen.org/sites/default/files/Chilling%20Effects_PEN%20American.pdf,
at 12-26.

DWT 24737867v4 0200656-000001

taken extra steps to mask their identities and the identities of sources; they have

avoided contacting potential sources, colleagues or collaborators if those people

could be endangered if it became known that they were speaking to a writer; and

some have even declined to meet with people who might be seen as security

threats.  *Id.* at 3; *See also* PEN Report.

Their narrative comments provide insight into the reasons for this new,

inhibited behavior.  One writer has "dropped stories … and avoided research on

the company telephone due to concerns over wiretapping or eavesdropping."  *Id.* at

6.  Another indicates that "the writers who feel most chilled, who are being most

cautious, are friends and colleagues who write about the Middle East."  *Id.*  Other

examples:

> I was considering researching a book about civil defense
> preparedness during the Cold War: what were the
> expectations on the part of Americans and the
> government? What would have happened if a nuclear
> conflagration had taken place? . . . How did the pall of
> imminent disaster affect Americans? But as a result of
> recent articles about the NSA, I decided to put the idea
> aside . . . .
>
> I write books, most recently about civil liberties, and to
> protect the content of certain interviews, I am very
> careful what I put in emails to sources, even those who
> are not requesting anonymity. I'm also circumspect at
> times on the phone with them—again, even though they
> may not be requesting anonymity and the information is
> not classified . . . .

PEN Survey at 7, 8.

25

The message is clear: writers are restricting their activities and censoring their own work. As PEN's Executive Director Suzanne Nossel stated upon the release of the Survey, "[w]riters are kind of the canary in the coal mine in that they depend on free expression for their craft and livelihood." *See* Cohen, *Surveillance*. The harm for writers is immediate and direct, but the threat to freedom reaches far beyond them. Our society depends on the freedom of writers and others to gather information, exchange ideas, and openly express their views. Inhibiting writers deprives the public of necessary voices and undermines democracy. It is impossible to measure the harm we suffer from the loss of stories that writers do not write.

## III.   BALANCING FREEDOM AND SECURITY

The type of surveillance the Order permits can no doubt make law enforcement and intelligence gathering easier. Yet such sacrifices of privacy may gradually but fundamentally alter the delicate balance between liberty and security. As Justice Douglas warned, "[a]s nightfall does not come all at once, neither does oppression." Melvin I. Urofsky and Philip E. Urofsky eds., *Selections from the Private Papers of Justice William O. Dougla*s 162 (1987). Even where sacrifices of liberty are sought for legitimate ends, we should not lose sight of the fundamental values at stake: "Experience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent. . . . The greatest

dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding." *Olmstead*, 277 U.S. at 479 (Brandeis, J., dissenting).

For writers, the effects of the mass monitoring of electronic communications are not only practical and direct, but also subtle and indirect – because the sense of privacy essential to free expression and association is so compromised. Writers have now spoken clearly. The "insidious encroachment" predicted by Justice Brandeis by zealous and well-meaning protectors of our national security is being felt. Our pursuit of security must not blind us to the costs of sacrificing the liberty we seek to protect.

## **CONCLUSION**

For the foregoing reasons, *amicus curiae* PEN respectfully requests that the District Court's decision be reversed.

Dated:    New York, New York             Respectfully submitted,
          September 9, 2014
                                          DAVIS WRIGHT TREMAINE LLP

                                          By:   /s/ Thomas R. Burke

                                          505 Montgomery Street, Suite 800
                                          San Francisco, California 94111-6533
                                          Telephone: (415) 276-6500
                                          Facsimile: (415) 276-6599

                                          *Of Counsel:*
                                          Edward J. Davis
                                          Linda Steinman
                                          Lacy H. Koonce, III
                                          Eric Feder

DAVIS WRIGHT TREMAINE LLP
1633 Broadway, 27th Floor
New York, New York  10019
(212) 489-8230

*Attorneys for* Amicus Curiae
*PEN American Center, Inc.*

28

## **CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 29(d) and 32(a)(7)(B) because it contains 6,206 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in Times New Roman Font Style and 14 Point Size for the body of the brief and for the footnotes.


By: s/Thomas R. Burke
     Thomas R. Burke

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 9, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Thomas R. Burke
Thomas R. Burke
