No. 14-35555

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

ANNA J. SMITH,

*Plaintiff-Appellant*,

*v.*

BARACK OBAMA, *et al.*,

*Defendants-Respondents.*

_____

On Appeal from the United States District Court for the District of Idaho, Boise;
Case No. 2:13-cv-00257-BLW
The Honorable B. Lynn Winmill, Chief District Judge

_____

**BRIEF OF THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND 17 MEDIA ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF-APPELLANT**

_____

Bruce Brown
  *Counsel of Record*
Katie Townsend
Hannah Bloch-Wehba
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1101 Wilson Boulevard, Suite 1100
Arlington, Virginia 22209
Telephone: (703) 807-2100
Facsimile: (703) 807-2109
*Additional amici counsel listed at end of document

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Ninth Circuit Rules of Appellate Procedure, *amici* disclose that:

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

American Society of News Editors is a private, non-stock corporation that has no parent.

Association of Alternative Newsmedia has no parent corporation and does not issue any stock.

Courthouse News Service is a privately held corporation with no parent corporation and no publicly held corporation holds more than 10 percent of its stock.

The E.W. Scripps Company is a publicly traded company with no parent company. No individual stockholder owns more than 10% of its stock.

First Amendment Coalition is a nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

First Look Media, Inc. is a non-profit non-stock corporation organized under the laws of Delaware. No publicly-held corporation holds an interest of 10% or more in First Look Media, Inc.

Gannett Co., Inc. is a publicly traded company and has no affiliates or subsidiaries that are publicly owned. No publicly held company holds 10% or more of its stock.

The Investigative Reporting Workshop is a privately funded, nonprofit news organization affiliated with the American University School of Communication in Washington. It issues no stock.

The McClatchy Company is publicly traded on the New York Stock Exchange under the ticker symbol MNI. Contrarius Investment Management Limited owns 10% or more of the common stock of The McClatchy Company.

The National Press Club is a not-for-profit corporation that has no parent company and issues no stock.

National Press Photographers Association is a 501(c)(6) nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

North Jersey Media Group Inc. is a privately held company owned solely by Macromedia Incorporated, also a privately held company.

Online News Association is a not-for-profit organization. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

Radio Television Digital News Association is a nonprofit organization that has no parent company and issues no stock.

The Tully Center for Free Speech is a subsidiary of Syracuse University.

WP Company LLC d/b/a The Washington Post is a wholly owned subsidiary of Nash Holdings LLC. Nash Holdings LLC is privately held and does not have any outstanding securities in the hands of the public.

# TABLE OF CONTENTS

Page

STATEMENT OF INTEREST OF AMICI CURIAE ............................................. 1

INTRODUCTION ................................................................................................ 6

ARGUMENT ........................................................................................................ 8

   I.   THE FOURTH AMENDMENT WAS INTENDED TO
       PROTECT A FREE PRESS FROM INTRUSION BY
       THE GOVERNMENT. ..................................................................... 8

   II.  THE INTEGRITY OF A CONFIDENTIAL REPORTER-
       SOURCE RELATIONSHIP IS CRITICAL TO
       PRODUCING GOOD JOURNALISM, AND MASS
       TELEPHONE CALL TRACKING COMPROMISES
       THAT RELATIONSHIP TO THE DETRIMENT OF
       THE PUBLIC. ................................................................................ 10

       A.   There is a long history of journalists breaking
           significant stories by relying on information from
           confidential sources. ............................................... 12

       B.   Recent developments highlight the link between
           mass call tracking and a chill on reporter-source
           communications. ..................................................... 14

       C.   Mass call tracking negates safeguards the
           government has pledged in response to threats to
           journalism. ............................................................. 19

   III. THE MASS TELEPHONE CALL TRACKING
       PROGRAM IS AN INHERENTLY OVERBROAD
       SYSTEM OF MONITORING AND INVESTIGATION. ................. 21

STATEMENT OF RELATED CASES ................................................................ 25

# TABLE OF AUTHORITIES

<u>Page(s)</u>

**Cases**

*Entick v. Carrington*, 19 How. St. Tr. 1029 (1765) ..................................................... 9

*Wilkes v. Wood*, 19 How. St. Tr. 1153 (1763) .......................................................... 9

*Application for Search Warrant for E-mail Account [redacted]@gmail.com*, No. 1:10-mj-00291-AK (D.D.C., Affidavit in support of application for search warrant, unsealed Nov. 7, 2011) ................................................................................ 12, 15

*Boyd v. United States*, 116 U.S. 616, 626 (1886) .................................................... 8

*Branzburg v. Hayes*, 408 U.S. 665 (1972) ............................................................... 11

*Frank v. Maryland*, 359 U.S. 360, 376 (1959) ........................................................ 10

*Marcus v. Search Warrant*, 367 U.S. 717 (1961) .................................................... 9

*Smith v. Maryland*, 442 U.S. 735 (1979) .................................................................. 7

*United States v. Jones*, 132 S.Ct. 945 (2012) ........................................................... 16

*United States v. Sterling*, 818 F. Supp. 2d 945 (E.D. Va. 2011) .............................. 13

**Other Authorities**

*Administration White Paper: Bulk Collection of Telephony Metadata Under Section 215 of the USA PATRIOT Act* (Aug. 9, 2013) ........................ 6

Byers, Dylan, *Reporters Say There's a Chill in the Air*, Politico (June 8, 2013) ............................................................................................... 17

Comm. To Protect Journalists, *The Obama Administration and the Press: Leak Investigations and Surveillance in Post-9/11 America* 3 (Oct. 10, 2013) ........................................................................ 18, 24

Department of Justice, *Report on Review of News Media Policies* (July 12, 2013) ................................................................................................ 19, 20

Editorial, *A Journalist 'Co-Conspirator'*, Wall St. J. (May 20, 2013) .................... 16

Editorial, *Another Chilling Leak Investigation*, N.Y. Times (May 21, 2013) ...................................................................................................... 15

*Face the Nation Transcripts*, CBS News (June 2, 2013) ........................................ 17

ii

## TABLE OF AUTHORITIES *(continued)*

Page(s)

Gellman, Barton, *NSA Broke Privacy Rules Thousands of Times Per Year, Audit Finds*, Wash. Post (Aug. 15, 2013)............................................22

Gerstein, Josh, *NSA broke rules on call-tracking program, court filings show*, Politico (Sept. 10, 2013) ....................................................22

Komperda, Jack, *White House, lawmakers push for federal reporter shield law in wake of AP phone records seizure*, The Reporters Comm. for Freedom of the Press, May 15, 2013.........................................20

Kravets, David, *Reporters Challenge Bonds' Leak Subpoena*, Associated Press (May 31, 2006)....................................................12

Leonnig, Carol D., *Court: Ability to police U.S. spying program limited*, Wash. Post (Aug. 15, 2013).............................................23

Nicholas, Peter, *Obama's Other Mission: Soothing Allies on Espionage*, Wall St. J. (Sept. 6, 2013) ........................................24

Pew Research Center, *Social Media and the 'Spiral of Silence'* 2 (August 26, 2014), http://pewrsr.ch/1uneuZl................................................19

Presidential Review Group on Intelligence and Communications Technologies, *Liberty and Security in a Changing World* (Dec. 12, 2013), http://1.usa.gov/1cBct0k...............................................21

Priest, Dana, *CIA Holds Terror Suspects in Secret Prisons*, Wash. Post (Nov. 2, 2005) ....................................................13

Privacy and Civil Liberties Oversight Board, Report on the Telephone Records Program Conducted Under Section 215 of the USA PATRIOT Act and on the Operations of the Foreign Intelligence Surveillance Court 164 (Jan. 23, 2014), http://bit.ly/1fjSbeJ ......................17

Redden, Molly, *Is the 'Chilling Effect' Real?*, The New Republic (May 15, 2013)...............................................19

Reilly, Ryan J., *NYT Reporter Seeks to Quash Subpoena; Says Gov't Tried to Intimidate Him*, Talking Points Memo TPMMuckraker Blog (June 22, 2011)................................................13

Risen, James & Eric Lichtblau, *Bush Lets U.S. Spy on Callers Without Courts*, N.Y. Times (Dec. 16, 2005)....................................................13, 24

## TABLE OF AUTHORITIES *(continued)*

<u>Page(s)</u>

Risen, James, *Lawmakers Question White House Account of an Internet Surveillance Program*, N.Y. Times (July 3, 2013) ......................... 23

Robinson, Eugene, *Obama Administration Mistakes Journalism for Espionage*, Wash. Post (May 20, 2013) ......................................... 16

Royce-Bartlett, Lindy, *Leak Probe Has Chilled Sources, AP Exec Says*, CNN (June 19, 2013) ............................................................. 15

Savage, Charlie, et al., *U.S. Confirms That It Gathers Online Data Overseas*, N.Y. Times, (June 6, 2013) ......................................... 21

Schuman, Jamie, *The Shadows of the Spooks*, The News Media and the Law, Fall 2013 ................................................................ 18, 19, 24

Sensenbrenner, James, *This Abuse of the Patriot Act Must End*, The Guardian (June 9, 2013) ............................................................. 22

Shane, Scott, David Johnston, James Risen, *Secret U.S. Endorsement of Severe Interrogations*, N.Y. Times (Oct. 4, 2007) ................... 13

Sherman, Mark, *Gov't Obtains Wide AP Phone Records in Probe*, Associated Press (May 13, 2013) ......................................... 14, 20

Transcript of President Obama's Press Conference (Aug. 9, 2013) ...................... 20

von Drehle, David, *FBI's No. 2 Was 'Deep Throat': Mark Felt Ends 30-Year Mystery of The Post's Watergate Source*, Wash. Post (June 1, 2005) ................................................................ 12

Walt, Vivienne, *European Officials Infuriated by Alleged NSA Spying on Friendly Diplomats*, Time (June 30 2013) ............................... 24

Zalesin, Jeff, *AP Chief Points to Chilling Effect After Justice Investigation*, The Reporters Comm. for Freedom of the Press (June 19, 2013) ................................................................ 14, 15

## STATEMENT OF INTEREST OF AMICI CURIAE[1]

The Reporters Committee for Freedom of the Press is a voluntary, unincorporated association of reporters and editors that works to defend the First Amendment rights and freedom of information interests of the news media. The Reporters Committee has provided representation, guidance and research in First Amendment and Freedom of Information Act litigation since 1970.

With some 500 members, American Society of News Editors ("ASNE") is an organization that includes directing editors of daily newspapers throughout the Americas. ASNE changed its name in April 2009 to American Society of News Editors and approved broadening its membership to editors of online news providers and academic leaders. Founded in 1922 as American Society of Newspaper Editors, ASNE is active in a number of areas of interest to top editors with priorities on improving freedom of information, diversity, readership and the credibility of newspapers.

Association of Alternative Newsmedia ("AAN") is a not-for-profit trade association for 130 alternative newspapers in North America, including weekly

---

[1] *Amici* file this brief with the consent of the parties pursuant to Federal Rule of Appellate Procedure 29. This brief was authored entirely by counsel for *amici*. No counsel for any party authored the brief in any part, nor did any party (or any person other than *amici* and their counsel) contribute money to fund its preparation or submission.

1

papers like The Village Voice and Washington City Paper. AAN newspapers and their websites provide an editorial alternative to the mainstream press. AAN members have a total weekly circulation of seven million and a reach of over 25 million readers.

Courthouse News Service is a California-based legal news service for lawyers and the news media that focuses on court coverage throughout the nation, reporting on matters raised in trial courts and courts of appeal up to and including the U.S. Supreme Court.

The E.W. Scripps Company is a diverse, 131-year-old media enterprise with interests in television stations, newspapers, local news and information websites and licensing and syndication. The company's portfolio of locally focused media properties includes: 19 TV stations (ten ABC affiliates, three NBC affiliates, one independent and five Spanish-language stations); daily and community newspapers in 13 markets; and the Washington-based Scripps Media Center, home of the Scripps Howard News Service.

First Amendment Coalition is a nonprofit public interest organization dedicated to defending free speech, free press and open government rights in order to make government, at all levels, more accountable to the people. The Coalition's mission assumes that government transparency and an informed electorate are essential to a self-governing democracy. To that end, we resist excessive

2

government secrecy (while recognizing the need to protect legitimate state secrets) and censorship of all kinds.

First Look Media, Inc. is a new non-profit digital media venture that produces The Intercept, a digital magazine focused on national security reporting.

Gannett Co., Inc. is an international news and information company that publishes more than 80 daily newspapers in the United States – including *USA TODAY* – which reach 11.6 million readers daily. The company's broadcasting portfolio includes more than 40 TV stations, reaching approximately one-third of all television households in America. Each of Gannett's daily newspapers and TV stations operates Internet sites offering news and advertising that is customized for the market served and integrated with its publishing or broadcasting operations.

The Investigative Reporting Workshop, a project of the School of Communication (SOC) at American University, is a nonprofit, professional newsroom. The Workshop publishes in-depth stories at investigativereportingworkshop.org about government and corporate accountability, ranging widely from the environment and health to national security and the economy.

The McClatchy Company, through its affiliates, is the third-largest newspaper publisher in the United States with 30 daily newspapers and related websites as well as numerous community newspapers and niche publications.

The Media Consortium is a network of the country's leading, progressive, independent media outlets. Our mission is to amplify independent media's voice, increase our collective clout, leverage our current audience and reach new ones.

The National Press Club is the world's leading professional organization for journalists. Founded in 1908, the Club has 3,100 members representing most major news organizations. The Club defends a free press worldwide. Each year, the Club holds over 2,000 events, including news conferences, luncheons and panels, and more than 250,000 guests come through its doors.

The National Press Photographers Association ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution. NPPA's approximately 7,000 members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, the NPPA has vigorously promoted the constitutional rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism. The submission of this brief was duly authorized by Mickey H. Osterreicher, its General Counsel.

North Jersey Media Group Inc. ("NJMG") is an independent, family-owned printing and publishing company, parent of two daily newspapers serving the residents of northern New Jersey: *The Record* (Bergen County), the state's second-

largest newspaper, and the *Herald News* (Passaic County).  NJMG also publishes more than 40 community newspapers serving towns across five counties and a family of glossy magazines, including (201) Magazine, Bergen County's premiere magazine. All of the newspapers contribute breaking news, features, columns and local information to NorthJersey.com.  The company also owns and publishes Bergen.com showcasing the people, places and events of Bergen County.

Online News Association ("ONA") is the world's largest association of online journalists. ONA's mission is to inspire innovation and excellence among journalists to better serve the public. ONA's more than 2,000 members include news writers, producers, designers, editors, bloggers, technologists, photographers, academics, students and others who produce news for the Internet or other digital delivery systems. ONA hosts the annual Online News Association conference and administers the Online Journalism Awards. ONA is dedicated to advancing the interests of digital journalists and the public generally by encouraging editorial integrity and independence, journalistic excellence and freedom of expression and access.

Radio Television Digital News Association ("RTDNA") is the world's largest and only professional organization devoted exclusively to electronic journalism. RTDNA is made up of news directors, news associates, educators and students in radio, television, cable and electronic media in more than 30 countries.

RTDNA is committed to encouraging excellence in the electronic journalism industry and upholding First Amendment freedoms.

The Tully Center for Free Speech began in Fall, 2006, at Syracuse University's S.I. Newhouse School of Public Communications, one of the nation's premier schools of mass communications.

WP Company LLC (d/b/a The Washington Post) publishes one of the nation's most prominent daily newspapers, as well as a website, www.washingtonpost.com, that is read by an average of more than 20 million unique visitors per month.

## INTRODUCTION

For more than seven years, the National Security Administration ("NSA") has been collecting logs of the time and duration of most telephone calls placed or received by individuals in the United States with the approval of the Foreign Intelligence Surveillance Court. *See Administration White Paper: Bulk Collection of Telephony Metadata Under Section 215 of the USA PATRIOT Act* (Aug. 9, 2013), available at http://bit.ly/15ebL9k. Appellant argues that this practice violates her Fourth Amendment right to be free from unreasonable searches and seizures, and sought injunctive relief in the district court to prevent the NSA from collecting and analyzing her telephone data. Mem. Decision. at 1. The district court denied that request and dismissed Appellant's action, holding that under the

Supreme Court's 1979 decision in *Smith v. Maryland*, 442 U.S. 735 (1979), Appellant had no reasonable expectation of privacy in the telephone numbers that she dialed. *Id.* at 8. She appealed.

Mass, indiscriminate call tracking chills newsgathering and induces self-censorship. *Amici* write to emphasize the corrosive effect that this broad and indiscriminate collection of call data has on the ability of the media to gather and report information concerning matters of public interest. Throughout America's history, confidential communications between journalists and sources have led to news stories of the greatest public importance. Yet blanket, mass monitoring of calls undermines any promise of confidentiality made by a reporter because it reveals the frequency, time, and duration of communications between that reporter and his or her sources. And knowledge that communications are being monitored has led both sources and reporters to self-censor, interfering with newsgathering and diminishing the quality of reporting. Since the public has become aware of widespread call tracking by the government, many reporters at major news outlets have said that this program and other NSA surveillance efforts have made sources less willing to talk with them, even about matters not related to national security, resulting in a press that is less capable of keeping the executive branch and Congress accountable and a public that is less informed on matters at the heart of democratic governance.

**ARGUMENT**

## I. THE FOURTH AMENDMENT WAS INTENDED TO PROTECT A FREE PRESS FROM INTRUSION BY THE GOVERNMENT.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const, amend. IV. This prohibition on unreasonable searches of "papers" arose from a litany of abusive practices in the colonial era, including the issuance of "general warrants," which allowed law enforcement to search "private houses for the discovery and seizure of books and papers that might be used to convict their owner of the charge of libel." *Boyd v. United States*, 116 U.S. 616, 626 (1886).

The Fourth Amendment's roots are intertwined with the First Amendment guarantees of free speech and a free press. Indeed, the history of the Fourth Amendment is "largely a history of conflict between the Crown and the press." *Stanford v. Texas*, 379 U.S. 476, 482 (1965). Two landmark cases that form the basis for our understanding of the history and purpose of the Fourth Amendment right to be secure from unreasonable searches and seizures—*Entick v. Carrington* and *Wilkes v. Wood*—unsurprisingly both involve the press.

In *Entick v. Carrington*, the British Secretary of State issued a general warrant for Entick, a writer for a dissenting publication, and his papers; the King's

8

messengers ransacked Entick's house to find seditious material that was to be brought before the secretary of state. 19 How. St. Tr. 1029 (1765). Lord Camden decried the general warrant, writing of Entick, "His house is rifled; his most valuable secrets are taken out of his possession, before the paper for which he is charged is found to be criminal by any competent jurisdiction, and before he is convicted either of writing, publishing, or being concerned in the paper." *Id.* at 1064. Lord Camden dismissed the contention that "this power is essential to government, and the only means of quieting clamors and sedition." *Id.*  He reviewed the long history of the Star Chamber's persecution of the press and the dangers that general warrants continued to pose and concluded that the general warrant could not stand.  *Id.*  In *Wilkes v. Wood*, Lord Camden again dismissed a general warrant issued against a dissenting printer. 19 How. St. Tr. 1153 (1763). In doing so, he concluded that the "discretionary power given to messengers to search wherever their suspicions may chance to fall" was "totally subversive of the liberty of the subject." *Id*. at 1167.

In short, "[t]he Bill of Rights was fashioned against the background of knowledge that unrestricted power of search and seizure could also be an instrument for stifling liberty of expression," *Marcus v. Search Warrant*, 367 U.S. 717, 729 (1961), and for undermining freedom of the press.  While the government may now proffer different justifications than "the search for the nonconformist that

9

led British officials to ransack private homes" in 1765, *Frank v. Maryland*, 359 U.S. 360, 376 (1959) (Douglas, J., dissenting), mass call tracking in 2014 poses the same threat to newsgathering and reporting that general warrants did.  Indeed, as set forth in more detail below, constant, indiscriminate government surveillance of calls impacts confidential reporter-source relationships and chills the exercise of First Amendment rights.

## II.    THE INTEGRITY OF A CONFIDENTIAL REPORTER-SOURCE RELATIONSHIP IS CRITICAL TO PRODUCING GOOD JOURNALISM, AND MASS TELEPHONE CALL TRACKING COMPROMISES THAT RELATIONSHIP TO THE DETRIMENT OF THE PUBLIC.

By undermining the confidentiality of crucial reporter-source relationships, the mass call tracking at issue is harming journalism of all types and preventing the press from fulfilling its constitutionally-recognized role of gathering and disseminating the news for the benefit of the public.

Wholesale government monitoring of calls leaves phone users uncertain of the privacy of their communications and thus makes them unwilling to exchange potentially sensitive information.  And, as Justice Potter Stewart stated in his dissenting opinion in *Branzburg v. Hayes*, "[w]hen neither the reporter nor his source can rely on the shield of confidentiality against unrestrained use of [government] power, valuable information will not be published and the public dialogue will inevitably be impoverished."  408 U.S. 665, 732 (1972) (Stewart, J.,

dissenting).   Although Justice Stewart was referring to the chilling effect of government subpoenas on the reporter-source relationship, mass call tracking has the same effect.   Moreover, unlike subpoenas, which provide notice to the media, decisions about what call logs to review are made in secret, leaving both reporters and sources vulnerable to government surveillance at every turn, notwithstanding any promise of confidentiality.

Surveillance of telephone calls, in particular, impedes newsgathering because communications between sources and journalists regularly involve, and often require, the use of a telephone.   Indeed, as the Supreme Court recently recognized, cell phones are "such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy."   *Riley v. California*, 573 U.S. __, __ (2014) (slip op., at 9). Confidential relationships between sources and journalists are critical for effective reporting and an informed public, but constant call tracking requires journalists and sources to completely avoid one of the most (if not the most) commonly used communications channels in order to attempt to guarantee confidentiality.   As a result, government monitoring via mass call tracking limits journalists' ability to gather information in the public interest.   The result is self-censorship by sources and journalists and harm to the public discourse.

**A.    There is a long history of journalists breaking significant stories by relying on information from confidential sources.**

Confidentiality has long been essential to the news media's ability to fulfill its constitutionally protected duty to gather and disseminate information to the public about such matters as political corruption, national security and foreign affairs.   Many history-altering news stories would not have been reported without confidential communications between journalists and sources.

Anonymous sources were the foundation of the more than 150 articles *Washington Post* reporters Bob Woodward and Carl Bernstein wrote following the Watergate break-in.  *See* David von Drehle, *FBI's No. 2 Was 'Deep Throat': Mark Felt Ends 30-Year Mystery of The Post's Watergate Source*, Wash. Post (June 1, 2005), http://wapo.st/JLlYvZ.  Bernstein has said, "Almost all of the articles I co-authored with Mr. Woodward on Watergate could not have been reported or published without the assistance of our confidential sources and without the ability to grant them anonymity, including the individual known as Deep Throat."  *In Re Grand Jury Subpoenas to Mark Fainaru-Wada and Lance Williams*, No. CR-06-90225-JSW (N.D. Cal. June 15, 2006, affidavit in support of motion to quash subpoenas).

Other major stories have similarly relied on confidential sources.  *The New York Times* used these contacts to break the story that – long before the scope of the current surveillance came to light – the NSA had an illegal wiretapping

program that monitored phone calls and e-mail messages involving suspected terrorist operatives without the approval of federal courts. *See* James Risen & Eric Lichtblau, *Bush Lets U.S. Spy on Callers Without Courts*, N.Y. Times (Dec. 16, 2005), http://nyti.ms/neIMIB.[2] The *Times* also used confidential sources to report on the harsh interrogations that terrorism suspects in U.S. custody have faced. *See, e.g.*, Scott Shane, David Johnston, James Risen, *Secret U.S. Endorsement of Severe Interrogations*, N.Y. Times (Oct. 4, 2007), http://nyti.ms/1dkyMgF. *The Washington Post* relied on confidential government sources, among others, to break the story of the Central Intelligence Agency's use of "black sites," a network of secret prisons for terrorism suspects. *See* Dana Priest, *CIA Holds Terror Suspects in Secret Prisons*, Wash. Post (Nov. 2, 2005), http://wapo.st/Ud8UD.

_____

[2] Risen has testified to the efficacy and necessity of anonymous sources:

> In my ongoing reporting and news gathering, numerous sources of confidential information have told me that they are comfortable speaking to me in confidence specifically because I have shown that I will honor my word and maintain their confidence even in the face of Government efforts to force me to reveal their identities or information. The fact that I have not previously revealed my sources has allowed me to gain access to newsworthy information that I could not otherwise get.

*See* First Motion to Quash Subpoena, Attachment #2, Affidavit of James Risen at ¶ 64, *United States v. Sterling*, 818 F. Supp. 2d 945 (E.D. Va. 2011) (No. 10-485); *see also* Ryan J. Reilly, *NYT Reporter Seeks to Quash Subpoena; Says Gov't Tried to Intimidate Him*, Talking Points Memo TPMMuckraker Blog (June 22, 2011), http://bit.ly/l4N87v.

These are just a few examples of the important contributions to public knowledge that come from anonymous sources speaking to journalists. The mass call tracking at issue here compromises the ability of the news media to cultivate these sources.

### B. Recent developments highlight the link between mass call tracking and a chill on reporter-source communications.

The response to the Justice Department's recent seizure of records from 20 Associated Press telephone lines demonstrates the climate of fear that develops when government investigation tactics are brought to bear directly on the news media. *See* Mark Sherman, *Gov't Obtains Wide AP Phone Records in Probe*, Associated Press (May 13, 2013), http://bit.ly/11zhUOg. These records, from phone lines used by more than 100 AP reporters and editors, contained metadata—i.e. the numbers, timing and duration of calls. *See id*. This is the same type of information that the mass call-tracking program collects.

After learning about the secret subpoenas, AP President and CEO Gary Pruitt said in a speech at the National Press Club that the seizure has made sources less willing to talk to reporters at his news outlet: "Some of our longtime trusted sources have become nervous and anxious about talking to us, even on stories that aren't about national security." Jeff Zalesin, *AP Chief Points to Chilling Effect After Justice Investigation*, The Reporters Comm. for Freedom of the Press (June 19, 2013), http://rcfp.org/x?CSPl. The chilling effect, Pruitt said, is not limited to

14

the AP: "Journalists at other news organizations have personally told me it has intimidated sources from speaking to them." *Id.* He continued, "In some cases, government employees that we once checked in with regularly will no longer speak to us by phone and some are reluctant to meet in person." *See* Lindy Royce-Bartlett, *Leak Probe Has Chilled Sources, AP Exec Says*, CNN (June 19, 2013), http://bit.ly/11NGbOH.

Last year, the public also learned that the FBI identified Fox News journalist James Rosen as a "co-conspirator" in a search warrant application so that it could obtain his e-mails relating to the criminal investigation of a source. *See Application for Search Warrant for E-mail Account [redacted]@gmail.com*, No. 1:10-mj-00291-AK (D.D.C., Affidavit in support of application for search warrant, unsealed Nov. 7, 2011).

Many commentators have explored the connection between the Rosen case and an overall chill on the willingness of sources to come forward. *See* Editorial, *Another Chilling Leak Investigation*, N.Y. Times (May 21, 2013), http://nyti.ms/14vjDl5 ("With the decision to label a Fox News television reporter a possible 'co-conspirator' in a criminal investigation of a news leak, the Obama administration has moved beyond protecting government secrets to threatening fundamental freedoms of the press to gather news."); *see also* Eugene Robinson, *Obama Administration Mistakes Journalism for Espionage*, Wash. Post (May 20,

2013), http://bit.ly/13RvZrc ("The Obama administration has no business rummaging through journalists' phone records, perusing their emails and tracking their movements in an attempt to keep them from gathering news. This heavy-handed business isn't chilling, it's just plain cold.").

Together, the Rosen and AP cases show the danger to the flow of information to the public when the news media is subject to invasive investigations. *See* Editorial, *A Journalist 'Co-Conspirator'*, Wall St. J. (May 20, 2013), http://on.wsj.com/10K5nV7 ("With the Fox News search following the AP subpoenas, we now have evidence of a pattern of anti-media behavior. The suspicion has to be that maybe these 'leak' investigations are less about deterring leakers and more about intimidating the press.").

Controversial and exceptional cases involving subpoenas and search warrants targeting journalists and media organizations cause serious harm to newsgathering, but mass call tracking has an equal, and perhaps even greater, chilling effect, as sources now have very good reason to believe that logs of their phone contacts with reporters will always be on file with the government. This chilling effect is not surprising. "Awareness that the Government may be watching chills associational and expressive freedoms." *United States v. Jones*, 565 U.S. __, __ (2012) (slip op., at 3) (Sotomayor, J., concurring). Indeed, the Privacy and Civil Liberties Oversight Board ("PCLOB") concluded that the refusal of sources

to speak with journalists is "entirely predictable and rational" in light of revelations regarding mass call tracking. PCLOB, Report on the Telephone Records Program Conducted Under Section 215 of the USA PATRIOT Act and on the Operations of the Foreign Intelligence Surveillance Court 164 (Jan. 23, 2014), http://bit.ly/1fjSbeJ. PCLOB added that this self-censorship would cause "greater hindrances to political activism and a less robust press." *Id.*

Indeed, when such widespread surveillance is a standard practice, source intimidation is inevitable, leading to a less robust media. Former *New York Times* executive editor Jill Abramson told CBS's *Face the Nation*, "The reporters who work for the *Times* in Washington have told me that many of their sources are petrified to even return calls at this point." *Face the Nation Transcripts*, CBS News (June 2, 2013), http://cbsn.ws/1aGmeyd; *see also* Dylan Byers, *Reporters Say There's a Chill in the Air*, Politico (June 8, 2013), http://politi.co/11znRrJ ("Reporters on the national security beat say it's not the fear of being prosecuted by the DOJ that worries them — it's the frightened silence of past trusted sources that could undermine . . . investigative journalism[.] Some formerly forthcoming sources have grown reluctant to return phone calls, even on unclassified matters, and, when they do talk, prefer in-person conversations that leave no phone logs, no emails, and no records of entering and leaving buildings[.]").

In a report that former *Washington Post* executive editor Leonard Downie Jr. wrote for the Committee to Protect Journalists, numerous journalists said surveillance programs and leak prosecutions deter sources from speaking to them. Comm. To Protect Journalists, *The Obama Administration and the Press: Leak Investigations and Surveillance in Post-9/11 America* 3 (Oct. 10, 2013), http://bit.ly/1c3Cnfg. In the report, Associated Press senior managing editor Michael Oreskes commented: "There's no question that sources are looking over their shoulders. Sources are more jittery and more standoffish, not just in national security reporting. A lot of skittishness is at the more routine level." *Id.* *Washington Post* national security reporter Rajiv Chandrasekaran said: "One of the most pernicious effects is the chilling effect created across government on matters that are less sensitive but certainly in the public interest as a check on government and elected officials." *Id.* Discussing the NSA surveillance programs, *New York Times* investigative reporter and three-time Pulitzer Prize winner David Barstow stated, "I have absolutely no doubt whatsoever that stories have not gotten done because of this." Jamie Schuman, *The Shadows of the Spooks*, The News Media and the Law, Fall 2013, at 9.

Indeed, sources whose work is far-removed from the national security realm —including many federal employees, corporate directors and leaders of non-governmental organizations involved in publicly controversial topics—have

18

become less willing to talk. *Id.* at 11; *see also* Molly Redden, *Is the 'Chilling Effect' Real?*, The New Republic (May 15, 2013), http://on.tnr.com/18Lgq3D. ("Officials are reluctant to get anywhere close to the line…[I]t actually has been much harder to get people to talk about anything, even in a sensitive-but-unclassified area.").[3]

### C.    Mass call tracking negates safeguards the government has pledged in response to threats to journalism.

As a consequence of the outcry over the AP and Fox News seizures, the Department of Justice revisited its rules for issuing subpoenas and search warrants to the media. *See generally* Department of Justice, *Report on Review of News Media Policies* (July 12, 2013), http://1.usa.gov/12mkn9B. Among other things, the Justice Department now requires prosecutors to give the news media advance notice of a subpoena, except in rare cases where notice poses a clear and substantial threat to the investigation, risks grave harm to national security, or presents an imminent risk of death or bodily harm. *Id.* at 2. Such notice is given

---

[3] Indeed, some evidence suggests that this chilling effect is not limited solely to journalists and their sources, but is also being felt by the general public. A Pew Research Center survey conducted in summer 2013 found that 86 percent of respondents were willing to discuss NSA surveillance in person, but only 42 percent of Facebook and Twitter users were willing to do so on those social media platforms. Respondents were most likely to discuss NSA surveillance in private settings such as family dinners or restaurants with friends, and least likely to do so on social media. *See* Pew Research Center, *Social Media and the 'Spiral of Silence'* 2 (August 26, 2014), http://pewrsr.ch/1uneuZl.

so that "members of the news media [have] the opportunity to engage with the Department regarding the proposed use of investigative tools to obtain communications or business records[.]" *Id*. The report says the Justice Department also will create a News Media Review Committee to provide oversight of media-related investigations, *see id.* at 4, and that journalists would not be considered suspects for "ordinary newsgathering activities," *see id.* at 3.

In addition, the Obama administration has asked Congress to adopt a federal shield law, which would give journalists a qualified privilege not to testify about information from confidential sources. *See* Jack Komperda, *White House, lawmakers push for federal reporter shield law in wake of AP phone records seizure*, The Reporters Comm. for Freedom of the Press (May 15, 2013), http://rcfp.org/x?0lyA. President Obama also has pledged to reform the Foreign Intelligence Surveillance Court, which decides the constitutionality of many NSA programs. Transcript of President Obama's Press Conference (Aug. 9, 2013), http://1.usa.gov/13pyCLa. In addition to ordering the declassification of some of the Court's opinions, President Obama has said he would take steps to allow an adversary to argue before the Court, which now only hears from a government official. *Id.* Further, the Presidential Review Group tasked with evaluating the call tracking program recognized that the "potential danger of leaks" must be balanced against the responsibility of the press to "ferret out and expose information that

government officials would prefer to keep secret when such secrecy is unwarranted." Presidential Review Group on Intelligence and Communications Technologies, *Liberty and Security in a Changing World*, 127 (Dec. 12, 2013), http://1.usa.gov/1cBct0k.

By taking these steps, the government has indicated an interest in handling investigations impacting press freedom on a case-by-case basis, with meaningful analysis based on the particular set of circumstances. This commitment is meaningless if rampant mass call tracking continues unabated.

## III.   THE MASS TELEPHONE CALL TRACKING PROGRAM IS AN INHERENTLY OVERBROAD SYSTEM OF MONITORING AND INVESTIGATION.

Criminal investigations depend on monitoring the communications of suspects without running afoul of those suspects' constitutional rights. This strategy is vastly different from the mass call tracking at issue here. There is a significant distinction between monitoring specific communications, based on a particularized suspicion of wrongdoing, and the implementation of a widespread system of mass call tracking that stores information about every call made by the subscribers of a particular telephone service provider over a defined yet renewed time period. *See* Charlie Savage, et al., *U.S. Confirms That It Gathers Online Data Overseas*, N.Y. Times (June 6, 2013), http://nyti.ms/10SZXaO.

Internal protections built into these enormous databases cannot prevent overreaching in all cases.[4]  Government documents released in September of 2013 show that for a three-year period, until March 2009, the NSA regularly searched call logs of about 15,000 numbers without having a reasonable, articulable suspicion of terrorism.  Josh Gerstein, *NSA broke rules on call-tracking program, court filings show*, Politico (Sept. 10, 2013), http://politi.co/17UxEJR.  Further, an internal NSA audit from 2012 revealed that the agency conducted unauthorized searches of data, including phone records and e-mail, of thousands of Americans since 2008.  *See* Barton Gellman, *NSA Broke Privacy Rules Thousands of Times Per Year, Audit Finds,* Wash. Post (Aug. 15, 2013), http://wapo.st/16SWco2.  Such conduct—which has "include[d] unauthorized access to intercepted communications, the distribution of protected content[,] and the use of automated systems without built-in safeguards to prevent unlawful surveillance," *id.*—cast serious doubt on the government's ability to police itself when implementing such a far-reaching mass call-tracking program.  In fact, then FISA Court chief judge

---

[4] Rep. James Sensenbrenner (R-Wis.)—author of the USA PATRIOT Act, Public Law 107-56, 115 Stat. 272 (2001)— has criticized use of Section 215 of the Act to justify such a broad surveillance program: "The administration claims authority to sift through details of our private lives because the Patriot Act says that it can.  I disagree.  I authored the Patriot Act, and this is an abuse of that law."  James Sensenbrenner, *This Abuse of the Patriot Act Must End*, The Guardian (June 9, 2013), available at http://bit.ly/1duGJjt.

Reggie B. Walton said his court "does not have the capacity to investigate issues of noncompliance." Carol D. Leonnig, *Court: Ability to police U.S. spying program limited*, Wash. Post (Aug. 15, 2013), http://wapo.st/1cR581f.

Furthermore, public equivocations by national security leaders illuminate the need for judicial involvement to protect the important rights at stake. In response to a direct question at a Senate Committee hearing in March from U.S. Senator Ron Wyden asking, "Does the NSA collect any type of data at all on millions or hundreds of millions of Americans?," Director of National Intelligence James Clapper said, "No, sir." Glenn Kessler, *James Clapper's 'Least Untruthful' Statement to the Senate*, Wash. Post (June 12, 2013), http://wapo.st/170VVSu. After the disclosure of the "vast Internet surveillance program run by the National Security Agency," Clapper released a "letter of apology" to Congress, stating that the statements he made to the Senate were "clearly erroneous." James Risen, *Lawmakers Question White House Account of an Internet Surveillance Program*, N.Y. Times (July 3, 2013), http://nyti.ms/16PNs0q.

Equivocations and noncompliance make it impossible for individuals, including journalists and their sources, to understand the limits of the surveillance programs. While the government maintains that it only searches phone records in cases involving national security, this representation does not give reporters and sources enough information about the government's activities. Concerns over

23

"national security" can range from the very real threat of loss of life if certain information is published to international embarrassment and damage to trade relations when U.S. allies realize the American government has been spying on them. *See, e.g.*, James Risen and Eric Lichtblau, *Bush Lets U.S. Spy on Callers without Courts*, N.Y. Times (Dec. 16, 2005), http://nyti.ms/16C62Xp; Vivienne Walt, *European Officials Infuriated by Alleged NSA Spying on Friendly Diplomats*, Time (June 30, 2013), http://ti.me/19LYkl5; Peter Nicholas, *Obama's Other Mission: Soothing Allies on Espionage*, Wall St. J. (Sept. 6, 2013), http://on.wsj.com/15BeQ0f. Uncertainty about whether their communications are at risk of exposure causes sources on a wide range of topics to fall silent. *See* Comm. To Protect Journalists, *The Obama Administration and the Press: Leak Investigations and Surveillance in Post-9/11 America* (Oct. 10, 2013), http://bit.ly/1c3Cnfg; Jamie Schuman, *The Shadows of the Spooks*, The News Media and the Law, Fall 2013. This understandable hesitation on the part of sources to communicate with journalists makes newsgathering regarding national security stories extremely challenging at the very time that the surveillance programs are finally receiving the public scrutiny they deserve. Without judicial oversight, this problem could worsen. This Court has the opportunity to step in and vindicate well-established rights of the media and of the public.

24

## STATEMENT OF RELATED CASES

Undersigned counsel is aware of the following related case pending before this Court:

*United States v. Moalin*, No. 13-50572 (9th Cir. 2013).


Dated: September 9, 2014

<div style="text-align: right">

s/   Bruce Brown

Bruce Brown

*Counsel of Record*

Katie Townsend

Hannah Bloch-Wehba

REPORTERS COMMITTEE FOR

FREEDOM OF THE PRESS

1101 Wilson Boulevard, Suite 1100

Arlington, Virginia 22209

Telephone: (703) 807-2100

Facsimile: (703) 807-2109

</div>

Additional *amici* counsel:

Kevin M. Goldberg
Fletcher, Heald & Hildreth, PLC
1300 N. 17th St., 11th Floor
Arlington, VA 22209
*Counsel for American Society of News Editors*

Kevin M. Goldberg
Fletcher, Heald & Hildreth, PLC
1300 N. 17th St., 11th Floor
Arlington, VA 22209
*Counsel for Association of Alternative Newsmedia*

Rachel Matteo-Boehm
Bryan Cave LLP
560 Mission Street, Suite 2500
San Francisco, CA 94105
*Counsel for Courthouse News Service*

25

David M. Giles
Vice President/
Deputy General Counsel
The E.W. Scripps Company
312 Walnut St., Suite 2800
Cincinnati, OH 45202

Peter Scheer
First Amendment Coalition
534 Fourth St., Suite B
San Rafael, CA 94901

Lynn Oberlander
General Counsel, Media Operations
First Look Media, Inc.
162 Fifth Avenue
8th Floor
New York, New York 10010
(347)-453-8111

Barbara W. Wall
Vice President/Senior
Associate General Counsel
Gannett Co., Inc.
7950 Jones Branch Drive
McLean, VA 22107

Karole Morgan-Prager
Juan Cornejo
The McClatchy Company
2100 Q Street
Sacramento, CA 95816

Charles D. Tobin
Holland & Knight LLP
800 17th Street, NW
Suite 1100
Washington, DC 20006
*Counsel for The National Press Club*

Mickey H. Osterreicher
1100 M&T Center, 3 Fountain Plaza,

Buffalo, NY 14203
*Counsel for National Press Photographers Association*

Jennifer A. Borg
General Counsel
North Jersey Media Group Inc.
1 Garret Mountain Plaza
Woodland Park, NJ 07424

Michael Kovaka
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
*Counsel for Online News Association*

Kathleen A. Kirby
Wiley Rein LLP
1776 K St., NW
Washington, DC 20006
*Counsel for Radio Television Digital News Association*

John B. Kennedy
James A. McLaughlin
Kalea S. Clark
The Washington Post
1150 15th Street, N.W.
Washington, D.C. 20071

**CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. P. 37(a)(7)(C) AND CIRCUIT RULE 32-1 FOR CASE NUMBER 14-35555**

I certify that:

1.     Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, the attached brief is proportionally spaced, has a typeface of 14 points or more, and contains 5,371 words.

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2003 in 14-point Times New Roman font.


s/    Hannah Bloch-Wehba

Hannah Bloch-Wehba
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1101 Wilson Boulevard, Suite 1100
Arlington, Virginia 22209

## CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2014, an electronic copy of the foregoing Brief was filed with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit using the Court's CM/ECF system and was served electronically by the Notice of Docket Activity upon all parties in the case. I certify that all participants in the case are CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

<div style="margin-left:40%">

s/    Hannah Bloch-Wehba
Hannah Bloch-Wehba
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1101 Wilson Boulevard, Suite 1100
Arlington, Virginia 22209

</div>